STINGRAY, L.P., Appellant

v.

CONCORD TOWNSHIP ZONING HEARING BOARD and Concord Township and Chris A. Panarello, D.D.S. & Elaine L. Panarello, et al.

Stingray, L.P.

v.

Concord Township Zoning Hearing Board, Corcord Township, Chris A. Panarello, D.D.S. & Elaine L. Panarello; Daniel R. Mochocki & Louise E. Mochocki; William Theodore Pleibel III & Barbara Ann Rossi Pleibel

Appeal of: Chris A. Panarello, D.D.S. and Elaine L. Panarello, Daniel R. Mochocki and Louise E. Mochocki, and William Theodore Pleibel III and Barbara Ann Rossi Pleibel

Stingray, L.P.

v.

Concord Township Zoning Hearing Board, Concord Township, Chris A. Panarello, D.D.S. & Elaine L. Panarello, et al.

Appeal of: Concord Township.

Commonwealth Court of Pennsylvania.

Argued Feb. 24, 2009.

Decided June 3, 2009.

Donald T. Petrosa, Media, for designated appellant, Stingray, L.P.

Richard S. Clarkson, Jr., Woodlyn, for appellees, Chris A. Panarello, D.D.S., Elaine L. Panarello, Daniel R. Mochocki, Louise E. Mochocki, William Theodore Pleibel, III, and Barbara Ann Rossi Pleibel.

BEFORE: PELLEGRINI, Judge, and
COHN JUBELIRER, Judge, and
LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Stingray, L.P. (Stingray) appeals an order of the Court of Common Pleas of Delaware County (trial court) that will allow Stingray to construct a private road and bridge over a creek that are needed to provide access to its proposed cluster residential development. The order will limit the number of homes in the development to five, *i.e.*, the limit for a development served by a private road. Stingray asserts that because its private road will be built to the specifications of a public road, it should be exempted from this limit and allowed to build fifteen homes. The Panarellos, Mochockis and Pleibels (Objectors), who own land adjacent to Stingray's property, cross-appeal the trial court's decision to allow construction of the bridge, without which Stingray cannot build even five houses.

Stingray's property in Concord Township (Property) consists of approximately eighteen acres that Stingray seeks to develop as a cluster subdivision with fifteen half-acre lots and common open space. The Property lies between Mill Road and Evergreen Drive, but the developable portion of the Property does not front on either road. The Property would be landlocked except for a strip of land 50 feet wide and 800 feet long that connects the developable part of the Property to Mill Road. On this strip of land, Stingray proposes to build a road and a bridge over Chester Creek that will provide Stingray's proposed cluster development access to

Mill Road. Part of the access road will cross land that the Township believes to be a floodplain.

The use of land located in a floodplain is regulated by the Concord Township Zoning Ordinance (Zoning Ordinance). The Zoning Ordinance permits, by special exception, the construction of private roads and bridges in a floodplain area. It states that within a floodplain the following uses are permitted by special exception:

(a) Dams, culverts and *bridges* approved by the Commonwealth of Pennsylvania, Department of Environmental Protection.

(b) Grading or regrading of lands, and the construction of retaining walls.

(c) Recreation use, including park, day camp, picnic grove, golf course, fishing and boating club.

(d) *Private roads* and driveways.

(e) Storm sewers.

(f) The cutting, killing and destruction of trees over three inches in diameter.

(g) *Other uses similar to the above*, provided that the effect is not to alter the cross-sectional profile of the stream basin at the point of the proposed construction or use.

CONCORD TOWNSHIP ZONING ORDINANCE § 210–187.B(2) (2005); Reproduced Record at 226a (R.R. ____) (emphasis added). The Township's Subdivision and Land Development Ordinance (SALDO) provides that a private road may provide access to no more than five lots.[1] Lest its development be limited to five homes by the SALDO, Stingray sought to have its access

---

1. The SALDO provides:

Private residential streets are permitted only if they serve as access to no more than five lots. A maximum of three interior lots may access the private street. All lots which abut a private street shall use the

private street for access exclusively. Access for a maximum of five lots remains in effect regardless of whether or not the lots are large enough to be further subdivided.

SALDO § 160–39.E(1) (2006); R.R. 241a.

road termed a "public road." It argued that its public road was a use "similar" to the private road and, thus, allowed by reason of Section 210–187.B(2) of the Zoning Ordinance.

In April 2005, Stingray filed a special exception application with the Zoning Hearing Board to permit the construction of the access road and bridge, and then amended the application to request a variance. Stingray's application was opposed by the Township Board of Supervisors and, *inter alia*, the Objectors. The Zoning Hearing Board conducted six hearings between August 2005 and April 2006.

In support of its request to build a bridge over the creek between Mill Road and the site of Stingray's cluster development, Stingray presented the expert testimony of James Hatfield, a civil engineer. Hatfield testified that the bridge would cause the stream velocities to be higher in the main channel but would not affect the rest of the creek. Hatfield also stated that the bridge would increase water level in the stream only slightly. Using the Federal Emergency Management Agency Map (FEMA Map), the bridge would increase the water level in the floodplain by approximately one inch; using the Concord Township Floodplain Map (Concord Map), the bridge would increase the water level in the floodplain by approximately three and one-half inches. Hatfield testified that construction of the bridge would cost approximately $125 per square foot of deck area, in addition to the cost of the retaining walls and box culverts. According to Hatfield, "a single house or two houses could [not] justify the expenditure necessary to build a bridge over this stream." Notes of Testimony (N.T.), 3/15/06, at 63.

In his cross-examination, Hatfield acknowledged that his analysis did not account for the effect on the water level that could result from the accumulation of debris in and around the culverts. Further, he could not specify the extent to which the culverts would have to be clogged in order for flood waters to top the roadway. However, he stated that blocking one of the proposed culverts would require a large collection of debris or a very large "piece of debris, a tree, portion of a house ... wider than 28 feet." N.T., 1/18/06, at 55.

In response, the Township presented the expert testimony of Joseph Mastronardo, an engineer. According to Mastronardo, because of an "S" turn located immediately upstream, the location proposed for the bridge was not the most opportune. He also explained that the bridge would increase the velocity of the water flowing in the stream and could alter the course of its main channel. Mastronardo stated that because Chester Creek runs through heavily wooded areas, there is a high potential for debris buildup in and around the bridge, which would elevate the flood hazard.

The Township also presented testimony of its Code Enforcement Officer, Manos Kavidias, who testified that the single access road to the Stingray development over a stream presented a health and safety concern. Kavidias stated that the Township limits the length of cul-de-sacs to assure proper egress, which included the need to "provide necessary life services;" he did not explain how the cul-de-sac Stingray proposed would impede the delivery of emergency services. N.T., 1/18/06, at 118. Kavidias stated that the length of Stingray's proposed access road and cul-de-sac, coupled with the bridge providing the exclusive means of access to the Property, would "exacerbate an al-

ready difficult situation." [2] *Id.* Kavidias testified that there are other cul-de-sacs in the Township that exceed the maximum length permitted by the SALDO, but he was not aware of any other development within Concord Township where the only access is over a stream.

Two Objectors, Panarello and Pleibel, also testified. Panarello testified that he had lived adjacent to the Property since 1969 and had witnessed a severe flood on the Property in 1970. N.T., 2/15/06, at 10–11. Pleibel also testified that the proposed bridge and road would create a flood risk.

The Zoning Hearing Board denied Stingray's special exception to build a public road. It held that a public road is not permitted within the floodplain area by special exception because it is not "similar" to a private road in terms of use, traffic, dimension, maintenance and ownership. Finally, it concluded that

> the Zoning Ordinance can not logically be read to treat a public road as similar to a private road since if that is what had been meant, the explicit reference to "private" road in Zoning Ordinance Section 210–187.B(2)(d) would have been superfluous.

Board's Decision and Order at 35; R.R. 37a. The Board also denied the special exception for the reason that the unusually long access road and cul-de-sac proposed by Stingray presented a danger to the public welfare, and a public road placed a financial burden on the Township. Neither issue had been adequately addressed by Stingray, in the Board's view.

The Zoning Hearing Board also denied Stingray a variance, holding that it did not meet its burden. It reasoned as follows:

> [Stingray] provided no land cost or values, appraisal evidence, or other financial cost-benefit analysis justifying the need to develop more than five homes on the Property in order to justify the cost of building the bridge and related improvements, such that the construction of the bridge and related improvements was cost-prohibitive where only five lots could be developed, rather than the fifteen proposed.

Board's Decision and Order at 41; R.R. 43a. The Board also reasoned that granting the variance would be detrimental to the public welfare.

Stingray appealed. The trial court affirmed the Zoning Hearing Board's conclusion that a public road is not a permitted use in a floodplain either by right or special exception and that Stingray was not entitled to a variance to build a public road. However, the trial court reversed the Zoning Hearing Board's denial of a special exception to construct a bridge. The trial court concluded that Stingray demonstrated that the proposed bridge would not create any increased flood hazard beyond that which was inherent in the construction of any bridge. Without a bridge, the Property could not be developed at all, which was inappropriate in light of the fact that a bridge was expressly permitted by special exception. Accordingly, the trial court reversed the Board's disapproval of the proposed bridge.

2. Section 160–39.B(1) of the SALDO provides that

> [c]ul-de-sac streets shall not exceed 700 feet and shall be at least 250 feet in length. If the cul-de-sac street intersects another cul-de-sac street, the maximum total length of the sum of the streets shall not exceed 700 feet.

SALDO § 160–39.B(1); R.R. 236a. The total length of the roadway, or the "sum of the streets," proposed by Stingray would be 2,300 feet. Stingray notes that the length of the cul-de-sacs and roadway would be properly addressed in Stingray's subdivision and land development application and is not the subject of a variance request before the Zoning Hearing Board.

Stingray appealed the trial court's denial of its application to build a public road, and the Objectors and Township appealed the trial court's grant of the bridge application.[3] The three appeals have been consolidated.

In its appeal,[4] Stingray raises four issues. First, it contends that the Zoning Ordinance permits a public road in a floodplain as a use similar to a private road. Second, it contends that because that portion of its proposed road located on the bridge is permitted by special exception, then the rest of its road must be permitted. Third, it argues that it is entitled to a variance to construct a public road. Fourth, it argues that according to the FEMA Map, which was the only map to set forth the 100–year flood, Stingray's access road does not cross a floodplain and, thus, does not need either a special exception or variance to be built.

For their part, Objectors contend that the trial court erred in reversing the Board's denial of Stingray's request to build a bridge. Objectors contend that the evidence established a high probability of an adverse impact on the public health, safety and welfare resulting from the bridge construction. They argue that Stingray should avail itself of the remedies provided under the so-called Private Road Act to find another, more appropriate way to access its proposed development.[5]

We begin by addressing Stingray's threshold contention that the Board improperly used the Concord Map to determine whether the land over which its road

will be built is even a floodplain. Stingray argues that the Zoning Ordinance defines a floodplain as land affected by a 100–year flood. The FEMA Map is the only map that used a 100–year flood to determine floodplains in the Township, and it does not show a floodplain where Stingray wants to place its access road. By contrast, the Concord Map used a 500–year or a 1000–year flood to measure floodplains in the Township. The FEMA Map, Stingray notes, is the one used by the Department of Environmental Protection and FEMA to issue permits. The Objectors counter that it does not matter. The Zoning Ordinance authorized the Township to use the most restrictive map to define a floodplain, and it did so. The Concord Map shows a larger floodplain than the FEMA Map and is more restrictive of construction; thus, the Township appropriately used the Concord Map.

The issue turns on the language of the Zoning Ordinance. Section 210–186.A states, in relevant part, as follows:

*The identified floodplain area shall be those areas of the Township of Concord which are subject to the one-hundred-year flood,* as identified in the Flood Insurance Study (FIS) prepared for the County of Delaware by the Federal Emergency Management Agency (FEMA), dated September 30, 1993, . . . or the most recent revision thereof, or the Floodplain Conservation District Map for Concord Township, dated October 1971, as revised December 1977, *whichever is more restrictive.*

---

3. The Township, however, did not file a brief and participate in the appeal.

4. Where the trial court has taken no additional evidence, the scope of review is generally limited to whether a zoning hearing board committed an abuse of discretion or an error of law. *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 554, 462 A.2d 637, 639 (1983).

5. According to Objectors, the Private Road Act, Act of June 13, 1836, P.L. 551, *as amended,* 36 P.S. §§ 1781–2891, would allow Stingray to obtain access to the Property from Evergreen Drive, thereby avoiding any need for zoning relief.

ZONING ORDINANCE, § 210–186.A; R.R. 223a (emphasis added). A floodplain is defined as that land in the Township that is subject to a "one-hundred-year flood." The determination of a 100–year flood may be made by reference to one of two maps: the FEMA Map or the Concord Map. The Township may use the "more restrictive" of the two maps, so long as it depicts a 100–year flood. Thus, if the "identified floodplain" shown on the Concord Map does not represent a 100–year flood, then the Board erred in using it.

The Board failed to appreciate all the language in Section 210–186.A of the Zoning Ordinance. It simply observed that the Concord Map was "more restrictive" and, thus, the appropriate map to use. However, the Board cannot use the Concord Map unless it purports to show the contours of a 100–year flood, and the record does not answer this question.[6] Accordingly, we must remand to the trial

court for further evidentiary proceedings to determine whether the Concord Map depicted a 100–year flood, or a 500 or 1,000–year flood, as contended by Stingray.[7]

For the foregoing reasons, we vacate the order of the trial court and remand the matter for further proceedings in accordance with this decision.

### ORDER

AND NOW, this 3rd day of June, 2009, the order of the Court of Common Pleas of Delaware County in the above-captioned matter, dated December 19, 2007, is hereby VACATED and REMANDED for further proceedings in accordance with the foregoing opinion.

Jurisdiction is relinquished.

---

**6.** Hatfield, Stingray's engineering expert, testified that the Concord Map was based on "an extreme flood event" that occurred in Concord Township in October 1971. N.T., 9/21/05, at 59. He clarified the boundaries of the floodplain depicted on the Concord Map in the following colloquy:

    Q. How does the storm—you referred to it as a storm of record or flood of record of October of 1971, on which the [Concord Map] is based, how does that flood of record compare to a hundred year storm?

    A. The safest answer is to say it's much, much larger than the hundred year flood. It's larger than the 500–year flood.

N.T., 1/18/06, at 20. Hatfield went on to explain that the flood elevations of the Concord Map are "from three to five feet higher" than those of the FEMA Map and probably represent "at least a thousand year storm." *Id.* at 22. Hatfield's testimony was not disputed in this respect. The actual Concord Map is not in the record; however, its floodplain boundaries are shown in comparison to those of the FEMA Map on several of Stingray's exhibits. *See* Ex. A–7, A–8, A–13, A–14, A–17.

**7.** Because we remand for further proceedings, it is not necessary to address Stingray's other arguments or Objectors' contention. We note, however, that should Stingray be successful in showing, on remand, that only the FEMA Map could be used to determine floodplains in the Township, this is only the beginning for Stingray. It will need to address the other public health and safety concerns regarding other aspects of its proposed development. The Board found that the abnormally long cul-de-sac proposed by Stingray and the single access road to fifteen houses present a potential danger to the health, safety, and welfare of Township residents and would impose a financial burden on the Township if dedicated as a public road. These concerns, among others, will have to be addressed by Stingray before its proposed development can be realized. Further, even if Stingray's proposed road does not cross a floodplain, it does not follow that it can force the Township to accept the dedication of its access road as a public road.